UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| MICHAEL A. JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     CAUSE NO. 3:13-CV-1330 JD |
| | ) |
| LaPORTE COUNTY SHERIFF'S | ) |
| DEPARTMENT, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## <u>OPINION AND ORDER</u>

This matter is before the Court on the: (1) Motion of Defendants for Summary Judgment,
filed by Defendants, LaPorte County Sheriff's Department, the County of LaPorte, Indiana,
Sergeant Stephen Vance, individually and in his official capacity, and Captain Scott Bell,
individually and in his official capacity, on June 30, 2015 [DE 31]; and (2) Motion of
Defendants to Strike the Affidavit of John Alexander Israel, filed by Defendants, LaPorte County
Sheriff's Department, the County of LaPorte, Indiana, Sergeant Stephen Vance, individually and
in his official capacity, and Captain Scott Bell, individually and in his official capacity, on
December 3, 2015 [DE 55]. For the reasons set forth below, the Motion for Summary Judgment
[DE 31] is **GRANTED** and the amended complaint is **DISMISSED WITH PREJUDICE**. The
Motion to Strike [DE 55] is **GRANTED IN PART** and **DENIED IN PART**. The Motion to
Strike [DE 55] is **GRANTED** as to paragraphs 10-15 of Dr. Israel's affidavit, which are
**STRICKEN** as inadmissible testimony.

<u>Background</u>

Count I of the amended complaint alleges Defendants, LaPorte County Sheriff's Department and the County of LaPorte, Indiana, permitted and failed to address instances of intentional racial discrimination against Plaintiff, Michael Jones, and subsequently terminated Plaintiff's employment, in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. Section 2000e, *et seq.* [DE 21 ¶ 23.] Count II alleges claims against Sergeant Stephen Vance and Captain Scott Bell under Section 1983 in both their individual and official capacities for "subjecting plaintiff to racially derogatory comments, failing to take action to correct such comments, treating plaintiff differently as a result of his race, and ultimately firing Plaintiff from his position as a jail officer" which Plaintiff alleges was in furtherance of a policy, custom or practice of discrimination established or enforced by the defendants. [*Id.* ¶ 24.] Count III alleges that Defendants violated the Americans with Disability Act, 42 U.S.C. § 12111, *et seq.*, by refusing to accommodate his medical restrictions. [*Id.* ¶ 26.] Last, Count IV alleges Defendants' refusal to accommodate his medical restrictions and Plaintiff's subsequent termination were in retaliation for Plaintiff's filing a charge of discrimination against the Defendants with the EEOC and Plaintiff's complaints regarding discriminatory treatment against Plaintiff and other African-Americans. [*Id.* ¶ 28.]

The LaPorte County Sheriff's Department, the County of LaPorte, Indiana, Sergeant Stephen Vance, individually and in his official capacity, and Captain Scott Bell (hereinafter "Defendants") filed the instant motion for summary judgment on June 30, 2015 [DE 31], requesting that all claims in the amended complaint be dismissed. Defendants received leave to file an oversized memorandum, and filed their memorandum in support on July 30, 2015 [DE

37].  Plaintiff, Michael Jones, also received leave to file a memorandum in excess of the page limit, and filed his response on October 10, 2015 [DE 50].  Finally, Defendants filed a reply on December 4, 2015 [DE 61].

Defendants also filed a motion to strike the Affidavit of John Alexander Israel on December 3, 2015 [DE 55].  That motion is also fully briefed.  Consequently, both motions are ripe for adjudication.

Undisputed Facts

Preliminarily, the Court notes that Defendants object to portions of Jones' statement of facts which are "rife with improper argument and should be disregarded." [DE 61 at 2, citing *Potts v. A&A Mfgs. Co., Inc.*, 2010 WL 427762, at *1 (N.D. Ind. Jan. 29, 2010).] The Court has attempted to parse out the improper arguments, assumptions, opinions, and inferences set forth in Jones' statement of facts, and merely focus on the facts supported by evidence.  Both sides presented lengthy statements of facts - the Court has attempted to set them forth below, noting where there are disputes.

Michael Jones has lived and worked in Michigan City, Indiana, for most of his life [Jones Dep. at 9-10].  He has been married for the past 40 years to his wife, Nedra, and has four grown children [Jones Dep. at 7-8].  Jones was employed by the LaPorte County Jail for fifteen years as a jail deputy, from May 27, 1997, through July 24, 2012 [Answer ¶ 8; Jones Aff. ¶ 2].   In 2002 or 2003, Jones was reassigned to the jail cleaning crew [Jones Dep. at 22].  He held the rank of corporal from approximately 2004 through 2010 [Jones Aff. ¶ 2].   The title of "corporal" was not formally recognized as a rank within the department's chain of command [Bell Aff. ¶ 15; Vance Dep. at 204-05] and Jones was never assigned to supervise other officers [Jones Dep. at

25].   Prior to May 17, 2010, Jones had positive work evaluations and no disciplinary actions, and he also did not experience any incidents which he would regard as discriminatory or retaliatory [Jones Dep. at 30; Jones Aff. ¶ 2; Ex. D00120, 122, 124 and 125].

On May 17, 2010, Jones, who is African American, and two African-American inmates, Robert Jordan and Kenneth Lowe, who were members of Jones' cleaning crew, were on an elevator inside the jail.  According to Jones, Defendant Steven Vance (who had just been told that he was going to be promoted), stepped onto the elevator and announced to the other occupants: "I remember at a time and date that bitches like you wouldn't be riding with nobody like me on an elevator." [Jones Dep. at 39; Jordan Aff. ¶ 2; Vance Dep. at 26.]  According to Vance, he said, "You bitches need to get off the elevator when I get on" [Vance Dep. at 26, 28].  Vance denies that the statement was intended to be racially insensitive.  Vance claims he was just "in a good mood" and he was joking because he had just been told he was going to be promoted, and no one was good enough to be riding on the elevator with him at the time [Vance Dep. at 25-26, 105-06].

Jones and Jordan took the elevator statement as a racial slur and a reminder of the days when African Americans were not allowed to ride on the same elevator with white people [Jones Dep. at 40; Jordan Aff. ¶ 2].  Jones told Vance that he "owed us an apology" [Jones Dep. at 39].  Vance "didn't say anything," so Jones and the inmates went to Captain Scott Bell, the jail warden, to complain, but Captain Bell was on the phone and not available [Jones Dep. at 39, 42-43; Jordan Aff. ¶ 3].  According to Vance, he immediately went to the trustee block and apologized to the inmates [Vance Dep. at 107].   However, Jordan denies the apology ever occurred [Jordan Aff. ¶ 4].  Vance never made any other comments to Jones that he interpreted

as racist [Jones Dep. at 48-50]. Jones claims that either later that day or the next, Jones reported the incident to Captain Bell, and Bell said that "calling someone a racist is a serious, you know, matter." [Jones Dep. at 45.] However, Bell claims he did not learn of the incident until he received Jones' charge of discrimination, filed in February of 2012 [Bell Dep. at 34-35; Bell Aff. ¶¶ 19, 20].

The day after the elevator incident, Vance approached Robert Jordan and asked: "Are you the guy that had a problem with what I said on the elevator?" [Jordan Aff. ¶ 4.] Jordan reports that Vance was angry and told him something about having a degree in "diversity." [*Id.*] Vance claims that he wrote a report about the incident [Vance Dep. at 31] and that the report should be in the file [Vance Dep. at 34]. However, in the 2,179 pages of material that the County supplied in response to Plaintiff's discovery requests, no such report was found [Jones Aff. ¶ 4].

Shortly after the elevator incident, on June 1, 2010, Vance was promoted to Assistant Jail Commander with the rank of Sergeant [Vance Dep. at 25]. Vance testified that his "first order of business" after his promotion was to talk with Jones to clear the air about this incident [Vance Dep. at 32-33]. Jones denies the conversation ever occurred [Jones Aff. ¶ 5].

No further investigation of the elevator incident was done until 2012, after Jones filed his first EEOC complaint [Bell Aff. ¶¶ 20-26]. Bell claims he investigated the matter, met with Vance, spoke with one of the inmates present, and even though Captain Bell "understood that the statement was not intended to be or take as racially derogatory," he still verbally reprimanded Vance for an unprofessional comment [Bell Aff. ¶ 26; Bell Dep. at 3-35; Vance Dep. at 106]. A verbal reprimand should be documented [Vance Dep. at 36], but no such documentation was in

Vance's employment file [Jones Aff. ¶¶ 4,7]. Bell describes Vance's remark as "[j]ust kind of an off-the-cuff joke that he made while at work that had offended Officer Jones." [Bell Dep. at 34.] Bell also said:

A. Well, I did what would have amounted to an investigation. I took Mr. Jones' statement, talked to at least one of the inmates involved, maybe both of them, I don't recall, and then I talked to Sergeant Vance about it.

Q. You took a statement from Mr. Jones?

A. Well, his initial complaint, yes.

Q. Did you interview him in any other respect regarding that incident?

A. If you're asking if we had more than one conversation about the incident, I don't recall.

Q. Other than the written reports, do you recall any verbal report that Mr. Jones gave you of the incident?

A. No.

Q. You said you interviewed one of the inmates that was involved; is that correct?

A. Yeah, at least one of them.

Q. Was that person still an inmate of the jail when you interviewed him?

A. Yes.

Q. Do you recall that person's name?

A. No, but it's in the record somewhere I'm sure.

Q. Was that Robert Jordan?

A. Sounds familiar, but I'm not going to – without reading through the information I'm not going to verify that that was

his name.

[Bell Dep. at 36-37.]

Captain Bell conducted a taped interview with inmate Robert Jordan on approximately March 21, 2012 [Bell Aff. ¶ 23]. During the interview, Jordan (who was in custody at the time) states that he was not offended by Vance's statements on the elevator and he did not think they were racist [Jordan Aff. ¶ 6]. After his release from custody, Jordan provided a different version of how he took Vance's elevator remarks, and how his interview with Bell occurred. Jordan states:

> I was an inmate at the LaPorte County Jail in approximately May, 2010. I recall an incident when I was on the jail elevator with one other inmate and Officer Michael Jones. I recall another Jail officer, Steven Vance, getting on the elevator, looking at all three of us, and stating: "I remember a time when three bitches like you couldn't ride an elevator with someone like me." When the statement was made, I took it as a racial slur. It was my belief then and now that Vance's use of the term "bitches" was the same as calling us "Niggers" who had no right to ride on an elevator with a white man.

> \*                   \*                   \*

> In March of 2012 I was scheduled to be transferred to the Indiana Department of Correction's Reception Diagnostic Center. When the bus came for the transfer, I was kept from going to the RDC. Shortly after this, Sgt. Vance came and got me off of the cell block. He said to the other inmates "Don't worry, he's not snitching." He then said to me privately: "Do you know why you missed your bus [to the RDC]? It's because we need a statement from you." Sgt. Vance made it clear to me that if I wanted to leave the LaPorte County Jail, I needed to tell Captain Bell that I did not have a problem with Sgt. Vance's statements on the elevator. He then took me to Captain Bell's Office. At Captain Bell's office, Captain Bell said he wanted to talk to me about the elevator incident involving Sgt. Vance. Before he turned on a tape recorder, Captain Bell said "Sgt. Vance talked to you about this, didn't he?" The way Captain Bell said this added to my belief that I would have problems if I did not say what he wanted to hear. Captain Bell then turned on the tape and asked me about the

incident and if I thought Sgt. Vance's statements on the elevator were racist. I said no because I was very fearful for my continued safety at the LaPorte County Jail if I said anything other than what they wanted to hear.

After this, Sgt. Vance took me back to the cell block. On the way back he had the guards return to us a remote control for the TV that had been previously confiscated on Sgt. Vance's orders. This was very unusual, and I took it as a reward for my cooperation. I was allowed to leave on the next transport to the RDC.

[Jordan Aff. ¶¶ 2, 5-7.]

At the time of Vance's remarks on the elevator, Jones held the rank of Corporal, which he

had held since approximately 2004 [Jones Dep. at 25]. Vance states in his deposition that at the

time of the elevator incident Jones was not in his chain of command, but Jones "held a corporal

position so he was - - he would have had the authority to tell me what to do." [Vance Dep. at 29.]

In November 2010, Jones' rank was changed from corporal to administrative deputy because of a

reorganization [Jones Dep. at 57-58; Bell Aff. ¶ 27]. The jail removed the title of corporal from

the three jailers that held that title who did not supervise inmates [*Id.*; *see also* Mollenhauer Dep.

at 16-17]. Defendants claim Jones' "rank" is nothing more than ceremonial because he only

supervised inmates, not other jail employees. The "rank" was something created by an earlier

administration and carried no extra pay or benefits [Mollenhauer Dep. at 17; Vance Dep. at 105,

126-127, 128; Bell Aff. ¶¶ 15, 16, 27, 30]. Captain Bell states in his affidavit: "When the title of

corporal was abolished, nothing else changed with respect to those jailers' employment,

including their pay and employment benefits." [Bell Aff. ¶ 30.]

In April 2011, Jones' employment file reflects a written reprimand from Sergeant Vance,

accusing Jones of "failing to perform duties as assigned." [Jones Aff ¶ 8, Ex. D00261, D00268.]

Jones was told by Vance that Jones needed to prepare a daily report of his activities, which Jones

claimed he did, but he never saw this write-up until after it was disclosed in discovery [Jones

Aff. ¶ 8]. It is unsigned by Jones, despite the requirement in the LaPorte County Government

Policies and Procedures manual which reads:

> Whenever a disciplinary action is documented, an employee will be
> asked to acknowledge the action has been covered with them by their
> signature on the original document. Refusal to sign a document will
> necessitate the supervisor engaging a witness to acknowledge such
> refusal by their signature on the original document. An employee can
> be given a copy of the disciplinary document, once signed by the
> employee, upon request. The employee's signature will not signify
> agreement with the contents of the document, rather the fact that the
> document was covered with the employee. The employee will also
> have an opportunity to provide a statement on the original document.

[2.0 Disciplinary Actions and Separations (D), Vance Ex. 3.]

On October 3, 2011, Jones was delivering supplies to Deputy Hilda Evans in the 2 South

Control Pod when another deputy, Erik McCreary, greeted him with "something like, 'what you

doing, skillet?'" [Jones Dep. at 67.] Then McCreary changed it to "home skillet" and he said,

"Wsup Home Skillet." [*Id.* at 67-68; Ex. 5, D00110 (October 20, 2011 letter from Jones to

Bell).] Deputy Evans verbally reprimanded McCreary, telling him that his comments were rude

and disrespectful and told him to apologize to Jones [Jones Dep. at 67-69].

Jones had heard of the term "skillet" and he thought that it was "racial" and meant "black

or the other word, you know . . . the N word." [*Id.* at 68, 76.] Jones had not heard the term

"home skillet" before [Jones Dep. 68, 76]. Jones thought the term was racially charged and

reported the matter to Sergeant Vance [*Id.* at 69]. Sergeant Vance stated that he would

investigate the matter [Jones Dep. Ex. 5], and on October 6, 2011, Sergeant Vance informed

Jones that he had met with Captain Bell and based on definitions of "home skillet" pulled from

urbandictionary.com, they did not believe the phrase was racially motivated. [*Id.*] At the time, Captain Bell did not know the meaning of the phrase "home skillet," so he investigated the term and believed it was not a racial slur, but a slang term of endearment or another word for "homey." [Bell Aff. ¶¶ 34, 35.] Bell gave a copy of the printout from urbandictionary.com to Jones [Jones Ex. 6]. According to Jones, when Jones disputed Vance's take on the meaning of "skillet" or "home skillet," Vance got upset and Vance kept saying it was not racially motivated [Jones Dep. at 73]. Then Jones met with Sergeant Vance and Captain Bell in Bell's office, at which time Captain Bell said that his "in-laws from Georgia greet people with the phrase 'Home Skillet.'" [Jones Ex. 6.] Jones was told he could take the matter up with the NAACP or Human Resources, which Jones elected not to do [Jones Ex. 6]. Jones claims that he sent a letter to Captain Bell, dated October 10, 2011, in which he expressed his displeasure with the way Vance and Bell handled the situation [Jones Dep., Ex. 5], and put copies of this letter on the Chief Deputy's desk and into the Warden's mail slot [Jones Dep. at 79-80].

Jones' version of the events differs from Sergeant Vance's. Vance testified as follows:

> A. Well, that was my terminology that I made earlier. I am a little quick to respond so I kind of jumped him, McCreary, a little too prematurely for making a racial slur.
>
> Q. Okay. So you thought it was a racial slur, too, at the time?
>
> A. It sounded like one to me, yes.
>
> Q. All right. So what did you do with McCreary? Did you give him –
>
> A. I gave him a reprimand.
>
> Q. Okay. A verbal reprimand? A written reprimand?
>
> A. It was written.

Q. You gave him a written reprimand?

A. Uh-huh.

Q. That is a yes?

A. Yes.

Q. Okay. All right. Did you ask Mr. McCreary to apologize?

A. Yes. I made him write a letter.

Q. Okay. Did you prepare any reports regarding that situation?

A. Yes.

Q. And who did you give the report to?

A. Captain Bell.

Q. Did you ever have any meetings with Captain Bell regarding the situation?

A. Yes.

Q. Who else was present at those meetings?

A. The supervisors of Deputy McCreary. It was an internal investigation so it appeared at the time throughout -- I think it went on for a couple of days.

Q. What did you determine in the course of that investigation?

A. Ultimately, in the end, we determined that it was not a racial -- it was not a racial slur, or even delivered as such, however, it was a situation where we deemed that it was still unprofessional because it wasn't using titles that were being – the titles that were given, you know, like deputy. It was allowed to be what I refer to as, don't talk like an inmate. Be a little more professional.

[Vance Dep. at 53-55.] Vance states he issued McCreary a written reprimand and ordered

McCreary to provide Jones with a written apology [Vance Dep. at 53, 115]. Sergeant Vance

informed Captain Bell that Vance reprimanded McCreary for not using appropriate greetings and titles within the Sheriff's Office, and that McCreary provided Jones with a written apology [Bell Aff. ¶ 33].

However, Jones states to his knowledge, Vance did not verbally reprimand McCreary, and believes he did not order McCreary to apologize to Jones, either verbally or in writing [Jones Dep. at 76-78; Jones Aff. ¶ 10]. Eric McCreary's employment file does not mention the event, and does not contain a write-up, reprimand, or written apology [Jones Aff. ¶ 10, Ex. D00925-D01140]. There is a report in the employment file of a different deputy, Travis McKinney, supposedly written up by Vance and dated "10-6-2011" identifying "Deputy Travis McKinney" as the person who "uttered a remark that offended Mike Jones." [Jones Aff ¶ 10, Ex. D01147.] This report indicates that Vance reprimanded Deputy McKinney (not McCreary) for using an unprofessional greeting. Captain Bell authored an undated "Report Supplement" which also identified Travis McKinney as the deputy involved in the incident [Jones Aff. ¶ 10, Ex. D01148].

Starting in late October 2011, Jones was absent from work [Bell Aff. ¶ 48]. Jones used his accumulated sick time and vacation days to assist his wife following triple bypass surgery [Jones Dep. at 84; Crosslin Dep, Ex. 20]. While Jones was absent, the administration needed to assign someone else to perform his tasks [Vance Dep. at 123; Bell Aff. ¶¶ 48, 49]. Sergeant Vance gave inmates the cleaning jobs that Jones had been doing [Vance Dep. at 123]. Vance claims that having the inmates do what Jones had been doing was more efficient [Vance Dep. at 124].

On November 29, 2011, Jones applied for and received his first FMLA leave [FMLA

Leave of Absence Request I, attached as Defs.' Ex. I].  According to Jones, when he applied for the leave, he was told during a meeting with Sergeant Vance and Captain Bell that he was being demoted from administrative deputy to jail deputy [Jones Dep. at 84].  The reason that Captain Bell gave for this change was that they did not know how long Jones' wife was going to be sick [Jones Dep. at 85-86].  Vance also voiced criticism of Jones' work, which Jones claims was inaccurate or based upon misinformation [Jones Dep. at 86-88].  Jones had never received a negative evaluation prior to this time [Jones Dep. at 88, 92-93].  Jones followed up his statements with a letter to Captain Bell dated December 7, 2011, and stamped received on December 14, 2011 [Jones Aff. ¶ 12, Ex. D00108-109].  According to Defendants, Captain Bell told Jones they would be transferring Jones to the position of corrections officer because they needed someone to fulfill the administrative deputy role while Jones was gone and that the role was being performed more efficiently and had changed [Bell Aff. ¶ 57; Jones Dep. at 86, 88, 90].  Jones' pay remained the same [Jones Dep. at 93].

Jones returned from his FMLA leave to work in January 2012 [Jones Dep. at 108-09].  That same day, Corporal Stanz told him that Sergeant Vance wanted a maintenance report from him – a report that Jones claims he had already provided to Sergeant Vance before he began his FMLA leave [Jones Aff. ¶ 13].  Jones reminded Vance that he had already submitted the report, to which Vance replied: "nuts and bolts," but the following day, Corporal Stanz confirmed that the report had been turned in [Jones Dep. at 90-91; Jones Aff. ¶ 13].  On January 13, 2012, Jones needed to take his wife to a medical appointment during his shift.  Jones claims he had cleared this with the administration two days earlier, but a misunderstanding ensued after which he was assigned to the control room [Jones Aff. ¶ 14].  Because he had not worked in the control room

for several years, and needed training to do the job properly, Jones believed he was being set up to fail [Jones Aff. ¶ 14]. Shortly after this incident, Jones filed his first EEOC complaint on February 1, 2012 [Jones Aff. ¶ 14].

On or about February 8, 2012, Captain Bell learned that Jones was claiming he had a recurrent eye condition [Bell Aff. ¶ 60]. Neither Captain Bell nor Sergeant Vance had previously been aware of this condition [Bell Aff. ¶ 62; Vance Dep. at 116]. On February 9, 2012, Jones was stopped by Sergeant Vance who stated something like: "I didn't know you had a disability . . . I have one too. . . You have to come to a meeting." [Jones Dep. at 98]. Vance told Jones that he needed to meet with Captain Bell to discuss the disability. [*Id.*] According to Vance, Bell had been given a copy of Jones' EEOC complaint and this mentioned an eyesight disability, so Vance was assigned to look into it [Vance Dep. at 86]. Jones thought it was short notice for the meeting, and was hesitant to discuss the matter without representation since he had already filed his EEOC complaint [Jones Dep. at 98-99, 102]. Jones therefore obtained the assistance of Joan Chumley, a representative from the NAACP, and attended the meeting with Vance and Bell the following day [Jones Dep. at 99, 102].

On February 10, 2012, Jones attended the meeting with Captain Bell, Sergeant Vance, Corporal Vicki Stanz, and Chumly of the NAACP to discuss his disability and restrictions [Jones Dep. at 100, 102; Bell Aff. ¶¶ 64-66]. Jones was asked to get additional documentation from his eye doctor regarding any necessary restrictions [Jones Dep. at 104] and to provide the Department with information and any need that Jones may have for an accommodation [Bell Aff. ¶ 66]. Following the meeting, Bell spoke with Jones' shift commander, Sergeant Fick, and determined the Department could preliminarily accommodate Jones' vision disability by making

him a "floater" within the jail, which involved very little computer work [Bell Aff. ¶ 67]. A floater is a jail officer assigned to assist everyone within the jail [Vance Dep. at 124]. Floaters have freedom of movement within the jail and do things like transport inmates, bring people to and from processing, and respond to incidents [*Id.*]. Floaters needed to fill in if someone needs a break [*Id.*].

Jones claims that a report regarding his eye condition was already in his file [Vance Dep. Ex. 7, p. D00231], but Jones got another letter from his eye doctor and gave this to Captain Bell on February 16, 2012 [Vance Dep. Ex. 7, p. D00023; Jones Dep. at 104]. The doctor's letter stated that Jones was unable to perform prolonged near vision tasks such as computer data entry or extended reading and that, after each hour of near vision tasks, Jones required an hour or more of distant vision tasks and more than the recommended ten minute break each hour [Bell Aff. ¶ 68; Houck Feb. 14, 2012 letter, attached as Defs.' Ex. L; Rogers Dep. at 105]. Captain Bell discussed the restrictions with Sergeant Fick and determined that Jones could continue to serve as a floater and that Fick should assign Jones to the control room, which required use of a computer, only as needed and complying with the terms of the letter [Bell Aff. ¶ 69; Jones Dep. at 104; Vance Dep. Ex. 7, p. D00016]. Bell shared the information and Dr. Houck's letter with the Human Resources Director, Sheriff, Sergeant Vance, and Jones' other supervisors and told them about his decision [Bell Aff. ¶ 70; Bell Feb. 16, 2012 e-mail, attached as Defs.' Ex. M]. Jones did not complain to Bell about the accommodations and states that Captain Bell "went by what the doctor stated" in assigning Jones the floater position [Jones Dep. at 108].

That same day, February 16, 2012, Bell received an unfavorable performance evaluation of Jones that was apparently written by Sergeant Vance which covered the period of

15

July 1, 2010 through January 1, 2012 [Vance Dep. Ex. 13, p. D00152]. Unlike the previous

evaluations in the file (which covered the period from June 1, 2010 through December 31, 2011),

this evaluation was not signed by Jones [compare Vance Dep. Ex. 13, pp D00120, D00122,

D00124, D00125 with D00152]. Nor was this evaluation seen by Jones until after it was

received in discovery [Jones Aff. ¶16]. This is contrary to LaPorte County's Policies and

Procedures manual, which provides:

> 16.0 EMPLOYEE EVALUATION
>
> Full-time and part-time employees shall be evaluated annually no
> later than the end of the calendar year by their immediate supervisor
> and/or department head, utilizing the form included in the Appendix.
> It would be appropriate to evaluate the employee at their anniversary
> date each year. Once the evaluation is completed, the evaluation
> should be covered with the employee, signatures and dates should be
> obtained and the original evaluation should be forwarded to the
> Human Resources Department for placement in the employee's
> personnel file.

[Vance Dep., Ex. 4.] Although Bell's stamp is on the February 26, 2012 evaluation, he could not

explain how Vance could be providing an evaluation covering more than a six month period

[Bell Dep. at 50-51].

After returning from FMLA leave, Jones did not have a working radio [Jones Dep. at

109]. Possessing a working radio was mandated by the Jail's Standard Operating Guidelines

Manual [Vance Dep. Ex. 11, p. D00717]. However, Jones was not the only employee that had

issues with his radio [Vance Dep. at 117]. Sometime around June 1, 2010, the Department

started having problems with the radios working properly [Vance Dep. at 117]. Sergeant Vance

got many complaints about radios not working and received hundreds of other complaints about

radios not working from male and female, black and white officers [Vance Dep. at 80, 118-19].

Finally, the Department had to buy new radios but there was not enough money in the budget to issue every officer his or her own new radio, so the radios were kept at each station with the jail - officers were no longer assigned personal radios [Vance Dep. at 82].

Jones' attempts to get a working radio failed [Jones Dep. at 110-112], and after the February 10 meeting, Jones' Corporal told him to ask Vance again for a radio [Jones Dep. at 109]. At this time, Sergeant Vance was in charge of making sure officers had working radios [Bell Dep. at 44, 73-74]. Vance responded by telling Jones to "get the hell out of his office." [Jones Dep. at 109, 110.] Jones believed that the reason he was not given a working radio was directly related to the EEOC charge [Jones Dep. at 114, 115]. Jones did not receive a working radio until after the hanging incident discussed below [Jones Aff. ¶ 17].

On April 17, 2012, Vance came into the control room where Jones was working with another deputy, Felicia White. Vance looked at the log book and asked White why she hadn't logged a security check into the log book [Jones Dep. at 47-48]. The security check was not overdue and had not yet been performed, so White responded that the check had not yet been performed [Jones Dep. at 47-48, 51-56]. Vance demanded that White write Jones up for not doing the check, and she refused because it was not yet time for it. Vance then threatened to write both officers up [Jones Dep. at 48], and told White she was trying to protect Jones [Jones Dep. at 52]. Vance then went to Jones' shift Sergeant, Brian Nurnberg, and told him to write Jones up, but Nurnberg also did not write up Jones [Jones Dep. at 55-56]. Five days later, Nurnberg drafted a "verbal warning" form regarding this incident. The form is dated 4/22/12, and indicates that Jones "refused to sign." [Jones Aff. ¶ 18, Ex. D00104]. Jones never saw this form until after it was produced in discovery [Jones Aff. ¶ 18]. The pages from the LaPorte

County Jail Floor Log for April 17, 2012 that were attached to the warning show that every 15 minutes from 0600 hours through 1215 hours, the security checks were made [Jones Aff.¶ 18, Ex.D00105-107]. The "verbal warning" identifies the time of the offense as "1355 hrs" [Jones Aff, ¶ 18, Ex. D00104], but there is no log sheet to supported that claim in the record [Jones Aff. ¶ 18].

On April 29, 2012, while Jones was still without a working radio, he was performing his rounds on the S1 secure block. A young black inmate asked him for a Bible, which Jones got for him [Jones Dep. at 116-17]. When Jones returned on his next security check, he found the inmate hanging by a sheet from a sprinkler head inside his cell [Jones Dep. at 117]. Jones had no radio, so he yelled and jumped up and down to get the attention of the guards in the control room. They ultimately saw the commotion, opened the cell door and came to Jones' aid as he was trying to get the man down [Jones Dep. at 117-18]. Their efforts saved the inmate's life, and Jones was given a commendation for his actions [Vance Dep. at 65, Ex. 8; Bell Dep. at 46]. Jones testified that he was issued a working radio "immediately" after this incident [Jones Aff. ¶ 17, 19].

This was the second time Jones witnessed a hanging at the jail. According to Jones, this event affected him more because of the increased anxiety caused by the delay in being able to help the inmate since Jones had no radio to call in the Code 9. Jones was upset that time was lost while a young black man, the same age and complexion as Jones' son, was hanging in his cell [Jones Dep. at 118; Jones Aff. ¶ 20; *see also* Israel Aff, Ex. 2 (Intake Assessment)]. Jones notified Corporal Vermilyer on April 30, 2012, that he needed counseling [Jones Aff. ¶ 20, Ex. D00075 (First Report of Injury, p.2)], but none was provided [Jones Aff. ¶ 20]. He presented to

his family doctor, Anil Chawla on May 2, 2012, and Dr. Chawla suspected post-traumatic stress disorder (PTSD) [Jones Aff. ¶ 20; Ex. 1], and referred Jones to John Alexander Israel, Psy.D., for a psychological evaluation [Jones Aff. ¶ 20; Israel Aff. ¶ 3].

Dr. Israel saw Jones on May 7, 2012. The report from Dr. Israel's initial evaluation notes Jones' experience of the hanging, the lack of a radio or any debriefing after the event, and the growing feeling of racial hostility within the past year [Israel Aff. ¶ 4, Ex. 2]. Dr. Israel notes these factors in diagnosing Jones with post-traumatic stress disorder [*Id.*]. He recommended that Jones be placed off work at that point, but Jones continued working through June 1, 2012 [Israel Aff. ¶ 5; Jones Aff. ¶ 21]. After a visit on June 1, 2012, Dr. Israel drafted a letter dated June 2, 2012, taking Jones off work, but indicating Dr. Israel's belief that Jones' symptoms could be resolved within a relatively short time allowing him to return to work [Israel Aff. ¶ 5, Ex. 3].

On June 4, 2012, Jones requested and was granted FMLA leave [Jones Dep. at 120]. On July 11, 2012, Dr. Israel drafted another letter for Jones to take to his employer, releasing him back to work on July 16, 2012 and noting that he planned to re-evaluate Jones on July 18, 2012 [Israel Aff. ¶ 6; Ex. 4]. Dr. Israel listed four (4) restrictions in this letter: (1) "limited exposure to the cell where the incident occurred" (2) "limit hours to one shift of work," (2) "continue therapy with [Dr. Israel] to maintain his focus and reduce trauma," and (4) "should symptoms begin again, he should be allowed to leave work." [Israel Aff. ¶ 6; Ex.4; Jones Dep. at 122; Israel July 11, 2012 Letter.] Jones took this report to the jail that day and it was stamped received by Sergeant Vance [Vance Dep., Ex. 9]. Dr. Israel also telephoned the LaPorte County Jail and spoke to Sergeant Vance. He explained the restrictions to Vance and suggested to him that if the restrictions needed to be modified, to call Dr. Israel [Israel Aff. ¶ 7]. Dr. Israel's

impression was that Vance seemed completely disinterested in what the doctor had to say. [*Id.*] Vance did say that he would take the matter up with the Jail Commander in an attempt to discuss Jones' conditions and restrictions [*Id.*]. Dr. Israel then called Captain Bell, but was told that Captain Bell was unavailable [*Id.*]. Dr. Israel left a message asking Bell to call him regarding the restrictions, but neither Sergeant Vance, Captain Bell, nor anyone else from the jail ever called Dr. Israel [*Id.*].

On July 11, 2012, then-Chief Deputy Sosinski was contacted by Jail Administrative Assistant Crosslin and advised that Jones had new work restrictions [Sosinski Dep. at 4]. Because Captain Bell and Sergeant Vance were part of the pending EEOC complaint filed by Jones, Sosinski was asked to review Jones' restrictions [Sosinski Dep. at 4]. Sosinski was also aware of Jones' previous eye-related restrictions and how they were accommodated by Captain Bell [Sosinski Dep. at 8; Bell Feb. 16, 2012 e-mail]. Sosinski told Crosslin that the Department could not accommodate the restrictions for liability and safety concerns [Sosinski Dep. at 6, 17; Crosslin Dep. at 34, 37-38; Crosslin July 11, 2012 letter, Defs.' Ex. W]. Sosinski was concerned for the safety of Jones, the staff, and inmates, because if Jones was exposed to another traumatic event or crisis within the jail, he would have to leave right away and that isn't possible in jail [Sosinski Dep at 6]. Sosinksi also worried about Jones only working one shift because if a crisis arose, an officer may be required to stay over and "can't just get up and leave and go home. You have to stay there until that crisis is completely over." [Sosinski Dep. at 18.] Lastly, Sosinski did not think the Department could accommodate Jones' restriction that he have limited exposure to the cell where the incident occurred, because there could be another incident in that cell, and as a floater, Jones would need to respond [Sosinski Dep. at 20].

On July 18, 2012, Dr. Israel saw Jones again and reports that he was doing significantly better [Israel Aff ¶ 8]. Jones told Dr. Israel that he received a letter from human resources stating that they would not honor the accommodations that Dr. Israel had requested [Israel Aff ¶ 8]. According to Sergeant Vance, Captain Bell was out on FMLA leave when Dr. Israel's restrictions were received [Vance Dep. at 74]. Vance claims that while Captain Bell was out on FMLA leave, he was serving in his capacity for several months [Vance Dep. at 77]. Bell testified that his medical leave did not begin until February 2013, and that if Vance and Sosinski said otherwise, they were mistaken [Bell Dep. at 75-76]. Vance states he did not talk to Dr. Israel about the restrictions [Vance Dep. at 74]. Bell could not recall if he saw Dr. Israel's July 11, 2012 letter [Bell Dep. at 71], nor did he think he ever spoke to Dr. Israel about Jones' restrictions [Bell Dep. at 71]. Nevertheless, with regard to the July 11, 2012 letter, he stated that "there was just no time frame on it." [Bell Dep. at 72]. Bell claims he made specific requests for more information from Jones, either verbally or in writing [Bell Dep. at 21-22], but no such requests appear anywhere in the record, and Jones denies ever receiving any such requests, either verbally or in writing [Jones Aff. ¶ 23].

According to Vance, Bell told him to take the accommodations request to Chief Sosinski because Bell was on FMLA leave and wanted the matter taken to the next level of the chain of command [Vance Dep. at 73]. Sosinski states that Jeanne Albers (now Crosslin), called him on the phone and told him that the matter was being brought to her because Jones had named both Vance and Bell in an EEOC complaint [Sosinski Dep. at 4-5].

Chief Sosinski denies ever having seen Dr. Israel's letter or reviewing any other medical

documentation at the time he made the decision that Jones' accommodations could not be met, stating specifically: "I have reviewed them [the medical documents] before this deposition, but not during that time I had spoken with Mrs. Crosslin." [Sosinski Dep. at 5]. Sosinksi's knowledge of any restrictions came strictly through Crosslin and he did not independently review any medical reports or letters or notes [Sosinski Dep. at 6]. Sosinsky says he did not speak with Vance, Bell, Jones or Dr. Israel [Sosinski Dep. at 7], and his entire involvement with the decision was during a phone call between himself and Crosslin [Sosinski Dep. at 9]. He denied ever seeing the written version of his decision until "a couple weeks or so before this deposition." [Sosinski Dep. at 9, Ex.10, p. D00021-D00022.] Crosslin believes that she met in person with Sosinski, brought him the various medical records and reports [Crosslin Dep. at 36-37], and that Sosinski reviewed and approved the July 11, 2012 letter before it was sent "or else it wouldn't have gone to HR." [Crosslin Dep. at 38]. Crosslin believes her meeting with Sosinsky may have been about 10-15 minutes if she remembered correctly [Crosslin Dep. at 38]. She cannot remember if they called Jones or Dr. Israel. [Crosslin Dep. at 38-39].

Sosinski also noted that at the time of Jones' request, there was no County policy regarding the process to be followed in deciding whether an accommodation under the ADA could be made [Sosinski Dep. at 10]. This was the first time he had been called upon to make an accommodations decision with respect to the jail [Sosinski Dep. at 9-10], and he had not received any type of training or instruction in the process for handling ADA accommodation requests [Sosinski Dep. at 12]. Joyce Leon, the Director of Human Resources at the time, testified: "[t]he key is to try to provide the accommodation if at all possible" with the goal of getting the employee back to work [Leon Dep. at 23-24]. To this end, "[s]ometimes the doctors

are called and we send over the job description, ask the doctor to take a look at the essential functions and ask them what they think." [Leon Dep. at 24-25.] She did not know if that was done in Jones' case, but it had been done in the past [Leon Dep. at 25].

The next day, Jones was sent a letter which stated as follows: "[o]n July 11, 2012, you provided to this office your release with restrictions back to work on July 16, 2012. With the restrictions from John Alexander Israel Consulting Inc. and the restrictions from Houck Eye Care and refractive Surgery Center, we, unfortunately, are unable to accommodate your return to work on July 16." [Vance Dep. Ex. 10, p. D00148.] Jones did not have any conversations with anyone at the Department regarding his medical restrictions and did not provide anyone at the County with further information regarding his medical restrictions other than the information contained in the July 11, 2012 letter from his doctor [Jones Dep. at 125-28].

On July 24, 2012, Jones was sent a certified letter telling him that his employment was terminated that day because he had exhausted his FMLA leave and Jones was not entitled to any additional leave under the FMLA [Vance Dep. Ex. 5; Jones Dep. at 130; Crosslin Dep. at 20; Leon July 24, 2012 Letter, Defs.' Ex. Y]. Captain Bell testified that the Sheriff had the power to extend Jones' time off [Bell Dep. at 25]. Jones believes one other employee had been given extended time off, K.L.[1], a Caucasian female whose employment was extended after her FMLA leave was exhausted [Jones Aff, ¶ 25; Bell Dep. at 22-24; Jones Dep. Ex. 4, ¶ 6].

Dr. Israel, Jones' treating psychologist, testified in his affidavit that he was familiar with Indiana's workers compensation system and because Jones' post-traumatic stress syndrome was

---

[1]Defendants note this particular employee's situation was brought up in another case as well, *McMillion v. Mollenhauer*, No. 3:12-CV-673-TLS, 2014 WL 6809017 (N.D. Ind. Dec. 2, 2014), and her information was filed under seal and subject to a protective order pursuant to HIPAA in that case. [DE 61.] In an abundance of caution, to protect the employee's privacy, this Court will use the employee's initials.

directly caused by a work-related incident, he could have continued to have been off work under workers compensation without affecting his time under the FMLA [Israel Aff. ¶ 14]. Jones stated in his affidavit that the County employee manual allowed employees to be placed on voluntary furlough (unpaid time off that allowed them to keep their job), but this was not discussed with, or offered to Jones [Jones Aff ¶ 26, Ex. D00625-627].

According to the July 11, 2012 "memorandum" of Crosslin's meeting with Sosinski (which Sosinski may or may not have seen): "Chief Sosinski stated that under the following circumstances this staff member cannot effectively perform the duties that are required of him at the LaPorte County Jail. Specifically, incident management and daily activities could require any staff member to be held over for more than a one-shift period of time. Exposure to and managing traumatic events are a required part of the job duties of a jail officer." [Vance Ex. 10, p. D00021]. Jones stated that in the last six months of his tenure at the County, he was rarely allowed to work any overtime [Jones Aff. ¶27; Crosslin Dep., Ex. 20, at 1, 3]. Sheriff Mollenhauer testified that the jail had to eliminate most overtime because of budgetary cuts [Mollenhauer Dep. at 27-28].

Dr. Israel also addressed the overtime issue in his affidavit:

> With respect to the possibility that a jail guard could be "held over for more than one shift period of time," the two-day restriction that I recommended for Mr. Jones was that he not be assigned a doubleshift during those two days. If he needed to be held over, he could have been assigned to a lower-risk duty, such as in the control room, in receiving, or in laundry or food service during the overtime, and he could have been released from duty as soon as a replacement arrived. This could have been easily explained if someone at the jail had simply spoken to me.

[Israel Aff. ¶12]. Regarding Chief Sosinski's second point, Dr. Israel stated in his affidavit that:

As far as "exposure to and managing traumatic events," I would not have suggested he return to work at all if he had to be completely free from such exposure. I asked that his exposure to the specific cell where the hanging occurred be "limited." I would add that if this was really a concern of the employer's, then I do not understand why Mr. Jones was not offered counseling by the employer after the hanging event. Normally, after any such traumatic event, officers, as well as inmates who were involved, would be offered counseling. The failure to do so is contrary to standard correctional practices. The fact that counseling was not offered to Mr. Jones, despite his request for it, only served to exacerbate his symptoms and reflects a disregard for this concern.

[Israel Aff. ¶12].

## Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

A party opposing a properly supported summary judgment motion may not rely on

allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

I.    Motion to Strike

Defendants filed a motion to strike the affidavit of Jones' treating psychologist, John Alexander Israel (hereinafter "Dr. Israel") [DE 55]. Defendants argue that Jones failed to properly disclose Dr. Israel, and that his testimony fails to meet the minimal standards of Rule 702 and the requirements established by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Motions to strike are heavily disfavored, and usually only granted in circumstances where the contested evidence causes prejudice to the moving party. *Kuntzman v. Wal-Mart*, 673 F.Supp.2d 690, 695 (N.D. Ind. 2009); *Gaskin v. Sharp Elec. Corp.*, No. 2:05-CV-303, 2007 WL 2228594, at *1 (N.D. Ind. July 30, 2007) ("In general, motions to strike are disfavored.").

Jones did not disclose Dr. Israel as a witness, he did not provide any summary of Dr. Israel's opinions or testimony, and he did not provide an expert report for him. Plaintiff's expert disclosure deadline was October 31, 2014 [DE 23, 24]. The beginning portion of Dr. Israel's affidavit discusses his treatment and assessment of Jones [Israel Aff. ¶¶ 1-9]. But the ending paragraphs contain different information. In paragraph 10, Dr. Israel testifies about the July 11, 2012 letter written by Jeanne Albers (now Crosslin), which he had not seen "prior to its being supplied to me a few weeks ago" stating "[i]f anyone had contacted me regarding the concerns reflected in this letter, those concerns would have been addressed." [*Id.*] In paragraph 11, Dr.

Israel asserts "as reflected in my CV, I have worked in the correctional field since 1984" and goes on to say he is "familiar with the essential duties of jail guards assigned to work in various capacities within a jail environment, including the control room and receiving, and it is my opinion that the restrictions I placed on Mr. Jones in my 7/11/12 letter would not have interfered with the essential functions of those jobs as they are normally performed." [*Id.* ¶ 11.] Dr. Israel then opines about essential functions and practices in the jail, including if Jones needed to be held over to more than one shift, "he could have been assigned to a lower-risk duty, such as in the control room, in receiving, or in laundry or food service during the overtime." [*Id.* ¶ 12.] In paragraph 13, Dr. Israel states, "if the employer had made any effort to contact me regarding the restrictions, it is virtually certain that the restrictions could have been structured to allow Mr. Jones' return to work both during the proposed trial period, and on a long-term basis." [*Id.* ¶ 13.] In paragraph 14, he testifies about the Indiana's workers compensation system, and lastly, Dr. Israel contends that "[u]nder the circumstances, it is essential for the employer to explain to the employee any options that the employee might have available that would allow the employee to maintain his employment." [*Id.* ¶¶ 14-15.]

First, Defendants argue that Dr. Israel's affidavit should be deemed inadmissible because Jones did not properly identify Dr. Israel in pre-discovery disclosures or discovery responses. However, as Jones aptly points out, Defendants themselves identified Dr. Israel as a person with discoverable information. In Defendants' Rule 26 disclosures, item A(27) states:

> Dr. John Israel [sic.] 107 Woodland Court, Suite B, Michigan City, Indiana 46360, (219) 877-4758, is likely to have discoverable information concerning the facts relevant to the allegations in Plaintiff's Complaint, including but not limited to Plaintiff's diagnosis and treatment, work-related restrictions, statements made by Plaintiff, and Plaintiff's ability/inability to return to work.

[DE 62-1, at 5-6.] Plaintiff's Rule 26 disclosure then states that Jones' witnesses include: "All defendants and witnesses identified by defendants." [DE 56-1 at 2.] Moreover, Jones also supplied Defendants with the letter from Dr. Israel dated July 11, 2012 regarding Jones' restrictions and Jones' medical chart and bills from Dr. Israel [DE 56-1 at 2-3]. Additionally, Jones identified Dr. Israel in response to Defendants' interrogatories, and the responses were served on September 19, 2014, ten months prior to the close of discovery [DE 56-2, at 7-8; Answer to Interrogatory No. 15, p. 11]. Defendants took Jones' deposition eight months prior to the close of discovery, and questioned him about his treatment by Dr. Israel and about the July 11, 2012 letter [Jones Dep. at 120-24]. So, Defendants were aware of the existence of Dr. Israel.

However, the inquiry does not end there. Defendants also urge that Dr. Israel's affidavit is inadmissible because the doctor was never disclosed as an expert witness. "[A] party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A). However, only those witnesses retained or specially employed to provide expert testimony must submit an expert report complying with Rule 26(a)(2)(B). Fed. R. Civ. P 26(a)(2)(B). In this case, Jones contends that Dr. Israel was only a treating physician, and the majority of his affidavit is based upon his personal observations of Jones, phone conversations with Defendants, and personal knowledge regarding the duties of correctional officers. *See Zurba v. United States*, 202 F.R.D. 590, 591-92 (N.D. Ill. 2011) (citing *Richardson v. Consolidated Rail Corp.*, 17 F.3d 213, 218 (7th Cir. 1994)) ("a treating physician is not considered a retained expert for purposes of Rule 26(a)(2), and thus need not submit a report, if his testimony is based on observations made during the course of treatment, the testimony was not acquired or developed in anticipation of

28

litigation or for trial, and the testimony is based on personal knowledge.").

The Court agrees with Jones that paragraphs 1-9 of Dr. Israel's affidavit consist of testimony of a treating physician, who is providing testimony within determinations and observations made during his treatment of Jones. However, a treating physician is more than a fact witness for purposes of disclosure if his or her testimony consists of opinions based upon "scientific, technical, or other specialized knowledge," regardless of whether those opinions were formed during the scope of interaction with the plaintiff prior to litigation. *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 756 n.2 (7th Cir. 2004).

In *Musser*, the plaintiffs made the same argument that Jones makes here - that disclosure of the identity of the treating physician and an opportunity to depose was sufficient to satisfy the requirements of Rule 26(a). The Plaintiffs argued "it would be a pointless formality to disclose in writing a list of names and persons already known to [Defendant] through prior discovery, this time with the designation 'expert witness.'" [*Id.* at 757.] The Seventh Circuit rejected that argument, explaining the mere fact that an identity of a witness is disclosed and there is an opportunity to depose does not alleviate the mandatory disclosure requirement - the rules "demand this formal designation." [*Id.* at 755-57.] The *Musser* court instructed that "[d]isclosing a person as a witness and disclosing a person as an expert are two distinct acts." [*Id.* at 757.] The Seventh Circuit is clear that treating physicians who are offered to provide testimony outside of those determinations made in the course of treatment are required to submit a full expert report in accordance with Rule 26(a)(2). *See Meyers v. Nat'l R.R. Passenger Corp.*, 619 F.3 729, 734-35 (7th Cir. 2010) (finding treating physician who is offered to provide expert testimony as to the cause of plaintiff's injury, but who did not make that determination in the

course of providing treatment, was required to submit expert report); *Johnson v. Norfolk S. Ry. Co.*, No. 3:12-CV-102-JD, 2015 WL 3738545, at *3 (N.D. Ind. June 15, 2015) ("[t]reating physicians, if disclosed as fact witnesses, may testify only regarding personal observations, examinations, and diagnoses completed during the course and treatment and contained within the relevant medical records"); *Moriconi v. Koester*, No. 11-cv-3022, 2015 WL 328590, at *1 (C.D. Ill. Jan. 26, 2015) ("The properly disclosed treating physicians may testify as fact witnesses concerning examination, diagnoses, and treatment [of Plaintiff] but may not present expert testimony."); *Vandivier v. United States*, No. 1:12-CV-00260-TWP, 2013 WL 6058902, at *3 (S.D. Ind. Nov. 16, 2013) ("Failure to disclose a treating physician as an expert will permit them to testify only as a fact witness, not an expert witness.").

In this case, the Court finds that the information provided to Dr. Israel during this litigation, after he had completed treatment of Jones, cannot be a determination made in the course of treatment [Israel Aff. ¶¶ 10-12]. Additionally, Dr. Israel's opinions about the jail, which he claims are based upon his specialized knowledge and experience with correctional departments, and his testimony about the requirements for different positions within the jail, in-house counseling, and the Indiana Workmen's Compensation Act, are not opinions made during the course of treatment. [*Id.* ¶¶ 11-15]. Moreover, when an outside witness, not involved in the employment decision, offers opinions as to what may or may not be accommodated based upon the witnesses own purported specialized knowledge, that person is an expert, subject to Rule 702. *See Steffy v. Cole Vision Corp.*, No. 05-C-0204, 2008 WL 7053517, at *5 (E.D. Wis. Jan. 9, 2008) (finding treating physician not qualified to draw conclusions regarding work place accommodations under the ADA or to offer opinions on their reasonableness).

Jones also had an affirmative obligation to provide "summary disclosures in place of complete expert reports, of the opinions to be offered by expert witnesses who were not retained or specially employed to give expert testimony."  Fed. R. Civ. P. 26(a)(2)(C) (requiring a witness who is expected to present evidence under Federal Rule of Evidence 702, 703, or 705, who is not required to provide a written report, to still disclose the subject matter on which the witness is expected to present evidence and a summary of the facts and opinions to which the witness is expected to testify).  Jones argues there was sufficient disclosure because of the production of Dr. Israel's July 11, 2012 letter and the medical chart, but clearly, nothing in these documents discusses the opinions in paragraphs 10-15 of the affidavit regarding jail environments, whether Jones' restrictions interfered with the essential functions of jail guards, or Dr. Israel's correctional experience.

If a party fails to disclose a witness as required, that "party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Jones carries the burden of showing his non-disclosure was either substantially justified or harmless.  *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996).  Jones has put forth no justification for the failure to disclose.  The failure to disclose Dr. Israel as a fact witness may be considered harmless because Defendants knew about the existence of Dr. Israel and anticipated his testimony about his diagnosis and treatment of Jones.  However, the Court views the testimony in paragraphs 10-15 of Dr Israel's affidavit as specialized knowledge subject to the requirements of Federal Rule of Evidence 702, and the lack of disclosure does prejudice Defendants in this case and was not harmless.  Courts are directed to consider "surprise or prejudice to the party

against whom the evidence is offered " when determining whether to permit undisclosed evidence. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). As the *Musser* court explained, "[t]he failure to disclose experts prejudiced [the opponent] because there are countermeasures that could have been taken that are not applicable to fact witnesses, such as attempting to disqualify the expert testimony on grounds set forth in *Daubert* . . . retaining rebuttal witnesses, and holding additional depositions to retrieve the information not available because of the absence of a report." *Musser*, 356 F.3d at 757-58. Defendants have already gone through the time and expense of briefing the instant lengthy motion for summary judgment. It would not be fair to excuse the non-disclosure, and indeed, Jones' argument essentially "reduces Rule 37 to a dead echo and would empower a party, not the court, to set expert discovery deadlines." *White v. Geradot*, No. 1:05-CV-282, 2008 WL 4238953, at *4 (N.D. Ind. Sep. 10, 2008).

Consequently, Dr. Israel may testify in his affidavit as a fact witness concerning his personal observation, examination, diagnosis, and treatment of Jones, but not about information that goes beyond his individual observations made during his personal treatment of Jones and would amount to expert opinions as defined in Federal Rule of Evidence 702. *See, e.g., Johnson v. Target Corp.*, 487 Fed. Appx. 298, 301 (7th Cir. 2012) (district court properly limited treating physician to factual testimony because plaintiff did not disclose treating physician as an expert). Paragraphs 10-15 of Dr. Israel's affidavit are hereby stricken as inadmissible testimony.[2]  II.

---

[2] Defendants also argue that Dr. Israel's opinions should be excluded under Rule 702 because they do not meet the standards set forth by *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). [DE 56 at 10-16.] Defendants contend that Dr. Israel has no reliable basis for his opinions about possible accommodations, and he is not qualified to offer opinions about Jones' qualifications for workers compensation or opinions on employer's obligations under the ADA. Jones makes no response whatsoever to these arguments, and Dr. Israel's testimony could be stricken on this basis as well. Finally,

Motion For Summary Judgment

A.     Timeliness

First, Defendants contend that Jones' Title VII claims based upon any incidents occurring before April 1, 2011, are barred by the 300-day statute of limitations. *See* 42 U.S.C. § 2000e-5(e); *Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 857 (7th Cir. 1999).   Jones filed his first charge of discrimination with the EEOC on February 1, 2012 [DE 21 at ¶ 12].  Thus, Defendants argue Title VII excludes litigation of any alleged discriminatory acts occurring before April 1, 2011 (which would include the elevator incident which happened on May 17, 2010).  In response, Jones argues he is not asserting independent claims based upon actions that occurred outside of Title VII's 300 day limitations period or 42 U.S.C. § 1983's two year limitations period. [DE 50 at 24.] Rather, Jones contends that Plaintiff merely draws inferences of discrimination based upon two matters outside the limitations period (the 2010 elevator incident and Jones' loss of rank as corporal), but they are not used as independent claims, merely "as part of the mosaic of circumstantial evidence needed to sustain Jones' burden of proof." [DE 50 at 24.]   This is proper.  *See, e.g., Malin v. Hospira, Inc.*, 762 F.3d 552, 561 (7th Cir. 2014) (stating Title VII does not "bar an employee from using the prior acts [that fall outside the statute of limitations] as background evidence in support of a timely claim . . . We have of course followed that directive in many cases.").

B.     Title VII Claim for Retaliation

Jones specifically states in his opposition memorandum that: "[w]hile each individual

---

even if paragraphs 10-15 of Dr. Israel's affidavit were admitted, the Court notes that these portions of the affidavit still do not establish that certain positions existed within the LaPorte County Sheriff's Department or that they were vacant and available for Jones.

discriminatory or retaliatory act could be separately actionable, the ultimate harm that Jones

suffered was the loss of his job.  Therefore, for all practical purposes, all of Jones' claims are

merged into two basic causes of action: (1) Retaliation for complaining about workplace

discrimination, and (2) Violation of the Americans with Disabilities Act." [DE 50 at 25.] This

Court turns its attention to the retaliation claim under Title VII first.

Title VII prohibits employers from retaliating against employees who engage in activity

protected by the statute.  42 U.S.C. § 2000e-3(a).  The rubric has been that there are two ways

plaintiffs may prove their claims - the "direct" or "indirect" methods of proof.  *Castro v. DeVry*,

786 F.3d 559, 564 (7th Cir. 2015).   Yet recently, the Seventh Circuit has questioned these

standards.  In *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737 (7th Cir. 2013), the Seventh

Circuit stated that it:

> Hasten[ed] to join in the growing chorus of opinions in this circuit, signed
> onto by a majority of active judges, that have expressed frustration with
> the confusing "snarls and knots" of this ossified direct/indirect paradigm,
> and that have suggested a more straight-forward analysis of whether a
> reasonable jury could infer prohibited discrimination.  *See Coleman v.
> Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) ("By
> now, . . . the various tests that we insist lawyers use have lost their utility .
> . . In order to defeat summary judgment, the plaintiff one way or the other
> must present evidence that she is in a class protected by the statute, that
> she suffered  the requisite adverse action (depending on her theory), and
> that a rational jury could conclude that the employer took that adverse
> action on account of her protected class, not for any noninvidious reasons.
> Put differently, it seems to me that the time has come to collapse all these
> tests into one.").

As such, the main question  is whether a reasonable trier of fact can infer retaliation.  *Castro,*

786 F.3d at 564.

Jones specifies that he is proceeding under the direct method of proof [DE 47-1 at 25].

"Under this method, plaintiffs must offer evidence of three elements: (1) they engaged in

protected activity, (2) they suffered adverse employment actions, and (3) there was a causal connection between the protected activity and the adverse employment actions." *Castro*, 786 F.3d at 564 (citing *Greengrass v. Int'l Monetary Sys., Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015)). The first two elements are satisfied. Jones argues that he was retaliated against after he filed his initial EEOC claim [DE 50 at 25]. Jones did file an EEOC complaint, which is a protected activity, and he was terminated from his job, which is an adverse employment action.

The issue is whether Jones has offered sufficient evidence to create a genuine issue of material fact as to whether the filing of his complaint caused his termination. To establish the causal link, Jones does not claim he has any direct evidence of retaliation (indeed, there is no admission from the Department that they fired him because of his complaints about racial discrimination). Rather, Jones relies on circumstantial evidence. Circumstantial evidence suffices if "a convincing mosaic of circumstantial evidence" would permit a reasonable trier of fact to infer retaliation by the employer. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). In retaliation cases, like this one, the Seventh Circuit has recognized three categories of circumstantial evidence available to a plaintiff using this convincing mosaic approach. *Coleman v. Donahue*, 667 F.3d 835, 860 (7th Cir. 2012). The categories include: (1) evidence of suspicious timing; (2) evidence that similarly situated employees were treated differently, and (3) evidence that the employer's proffered reason for the adverse employment action was pretextual. *Id.* at 860. Plaintiffs may use these together, or each category of circumstantial evidence can suffice by itself to preclude summary judgment, depending upon its strength. *Id.* at 862.

1. <u>Suspicious Timing</u>

Suspicious timing can sometimes raise an inference of a causal connection, but temporal proximity alone is "rarely sufficient" to establish causation." *Castro*, 786 F.3d at 565 (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)); *see also Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) ("Evidence of temporal proximity, however, standing on its own, is insufficient to establish a causal connection for a claim for retaliation"); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation."); *E.E.O.C. v. Yellow Freight Sys.*, 253 F.3d at 943, 952-53 (7th Cir. 2001) (affirming summary judgment in favor of defendant in part because six-week gap between filing of EEOC charge and termination was insufficient to establish retaliation); *Jasmantas v. Subaru-Isuzu Auto., Inc.*, 139 F.3d 1155, 1157-58 (7th Cir. 1998) (holding three-month gap between employee's filing of EEOC charge and her discharge was insufficient to link filing of the charge to termination without other evidence); *Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 624 (7th Cir. 2012) (finding plaintiff's termination three weeks after filing a complaint, by itself, not sufficient to create a genuine issue of material fact to support a retaliation claim).

Jones claims that there is suspicious timing in this case because after Jones filed his EEOC complaint, "phony evaluations and false write-ups start[ed] to appear in Jones' file, culminating with his discharge four months later." [DE 50 at 34.] However, the Seventh Circuit has made it clear that a warning, write up, or negative performance evaluation does not amount to an "adverse employment action." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901-02 (7th Cir. 2003) ("without more, a performance evaluation of this type does not amount to an

adverse employment action."); *see also Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729-30 (7th Cir.

2011) ("Unfair reprimands or negative performance evaluations, unaccompanied by some

tangible job consequence, do not constitute adverse employment actions.").  To be "materially

adverse [it] must carry with it a tangible job consequence." *Williams v. Lovchik*, 830 F.Supp.2d

604, 620-21 (S.D. Ind. 2011); *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003)

(stating in the retaliation context, it is "well established" that negative performance evaluations

alone do not constitute adverse employment actions).   Jones has provided no explanation for

how an unsigned or misdated unfavorable evaluation dated February 16, 2012, or the April 17,

2012 write up which carried no consequences, are examples of suspicious timing of an adverse

employment action.  Nor has Jones shown that the negative evaluations impacted the decision to

terminate him because the Department's proffered reason for firing Jones was exhaustion of his

medical leave.

 To the extent that Jones hangs his hat on the fact that he was terminated approximately

five months[3] after filing the EEOC complaint, this fact alone does not support a reasonable

inference of retaliation.  Jones has not provided evidence to show a causal link between his filing

of the EEOC charge and his termination.  *See Sauzek*, 202 F.3d at 918 ("[s]peculation based on

suspicious timing alone . . . does not support a reasonable inference of retaliation; instead,

plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected

---

[3] Jones claims he was fired approximately four months after the Department learned about his filing of the EEOC charge [DE 50 at 34] and Defendants contend Jones' termination did not occur until five months after his protected activity [DE 61 at 17].  Jones' first charge of discrimination was filed on February 1, 2012 [Jones Aff. ¶ 14] and it was dated February 15, 2012 [Am. Compl. ¶ 12].   Jones claims that according to the defendant's EEOC response, Defendants learned of Jones' EEOC complaint shortly before the February 10, 2012 meeting between Vance, Bell, Jones and the NAACP representative. [DE 47-1 at 33-34, citing Bell Dep. Ex. 28, pp. 3-4.]  Jones was terminated on July 24, 2012 [Leon July 24, 2012 letter].  Therefore, Jones was terminated approximately five months after his protected activity.

actions."); *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 863 (7th Cir. 2015) (finding there must be "corroborating evidence of retaliatory motive" in addition to suspicious timing). "The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e-2(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *University of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534  (2013).

Morever, the passage of five months time is too long of a duration to infer evidence of causality.  The passage of weeks or months following the protected activity "mitigate[s] against allowing an inference of causation based on suspicious timing." *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012); *Johnson v. ITT Corp.*, No. 1:10-cv-142, 2011 WL 3875598, at *13 (N.D. Ind. Sept. 1, 2011) (finding two months separating the plaintiff's complaint and her suspension were insufficient to give inference of causality); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (holding a seven-week interval between plaintiff's complaint and her termination did not give rise to an inference of causality).  Consequently, Jones has not established that the timing in this case gives rise to an inference of retaliation.

### 2. Similarly Situated Employees

The second type of circumstantial evidence that may establish a convincing mosaic is evidence that similarly situated employees were treated differently.  A similarly situated employee must be directly comparable "in all material respects." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (quotation omitted).  There must be a substantial similarity so as to create the inference that discriminatory intent is the reason for the differing treatment. *Spath v. Hayes Wheels Int'l - Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000).

Jones provides no argument whatsoever in the body of his opposition memorandum that there was a similarly situated employee, outside of his protected class, who was treated in a more favorable manner than him. He does, however, include a few facts in his statement of genuine disputes which touch on one other employee. In an abundance of caution, the Court will address this issue even though Jones has not developed it through legal argument. Plaintiff asserts in his statement of fact [DE 50 at 21] that "Capt. Bell testified that the Sheriff had the power to extend Jones' time off" [Bell Dep. at 25], and that "[a]t least one other employee in Bell's recollection had been given extended time off, [K.L.], a Caucasian female whose employment was extended long after her FMLA leave was exhausted." [Jones Aff. ¶ 25; Bell Dep. at 22-24; Jones Dep. Ex. 4.] Jones testified about K.L.:

> She worked there five months, and they accommodate her restrictions and they - - she came back to work on full restrictions. And then when she couldn't do the full restrictions, they put her on part-time work on restriction. I never heard of, you know, jail - - at my time, when I worked there, for part-time work. And they put her on part- time work 'til she got better. And then she couldn't do the part-time work, so then she had to leave.

[Jones Dep. at 136.] Jones assumed that Sheriff Mollenhauer made the decision to allow K.L. to go part time, but he did not know that for sure, and Jones did not know why K.L. was allowed to stay [*Id.* at 136-37].

Jones has not provided enough information for this Court to conclude that K.L. was a similarly situated employee. The Court does not know what her job was, her alleged "restrictions," whether she had medical restrictions, whether she engaged in any protected activity, who decided to accommodate her by allowing her to work part-time, or the basis for that decision. Moreover, although Jones states in his affidavit that "I am aware of at least one other

employee, [K.L.], a Caucasian female, who was permitted to retain her job long after her FMLA leave was expired" [Jones Aff. ¶ 25], because Jones also testified that he believed she worked at the jail for five months [Jones Dep. at 136], she would not have even been eligible for FMLA leave yet.[4]

In their reply memorandum, Defendants point to *McMillion v. Mollenhauer*, No. 3:12-CV-673-TLS, 2014 WL 6809017, at *10 (N.D. Ind. Dec. 2, 2014), in which plaintiff McMillion, also an employee of the LaPorte County Sheriff's office, brought claims of, *inter alia*, FLMA leave and race discrimination against the Department, and complained that she was not paid for her FMLA leave when "another employee outside her protected class received paid leave, but the Plaintiff did not, so the differential treatment must have been based on her race." Defendants assert that employee was K.L., and have attached the redacted affidavit of Sheriff Michael Mollenhauer in the *McMillion* case as support [DE 61-1]. Judge Springmann found that the circumstances surrounding the other employee's leave (K.L.), did not permit an inference of discrimination in *McMillion*:

> The jailer who was placed on sick leave in 2007 was hospitalized for a life-threatening illness that she alleged she had contracted while working in the Jail, and that she intended to file a worker's compensation claim. The Sheriff, realizing that the jailer's illness was one that could have been contracted at work, concurred with the advise [sic.] of the County Attorney to extend the length of the jailer's sick leave under the County's formal policy, which allowed supervisors to grant additional paid sick leave on a case by case basis. The County Commissioner reversed the decision, instructing that paid leave was to cease immediately and that LaPorte County would not permit such action in the future. The jailer's employment was later terminated when it became clear that she could not return to work even part time. She subsequently filed a worker's

---

[4] Under the FMLA, an "eligible employee" is defined as "an employee who has been employed . . . for at least 12 months by the employer" and who has "at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A).

compensation claim that was settled pursuant to an agreement by the parties. The jailer who took sick leave in 2007 is not similarly situated to the Plaintiff. Although the proposed comparator need not be identical to the plaintiff in every conceivable way, the distinctions between a plaintiff and the comparator must not be so significant that they render the comparison effectively useless. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). The other jailer was never on FMLA leave, and the Sheriff believed she may have contracted her life-threatening illness through her work at the Jail. Moreover, the Sheriff had been instructed after extending pay to the other jailer in 2007 that he was not to do so in the future.

*McMillion*, 2014 WL 6809017, at *10.

The exact same analysis is appropriate in this case. Jones was on FMLA leave (K.L. was not), K.L. is different because the Department was concerned she contracted a life-threatening illness while working in the Jail, and lastly, the Department informed the Sheriff that he could not increase leave again in the future. In this case, Jones has not submitted evidence of a similarly situated employee treated differently, or evidence from which a reasonable trier of fact could conclude that his race was a factor in the decision not to extend his FMLA leave. Indeed, as Judge Springmann notes, "[i]f an employee is unable to return to work after 12 weeks, the employee no longer has any protections under the FMLA. *Dotson v. BRP U.S. Inc.*, 520 F.3d 703, 709 (7th Cir. 2008). Additionally, her inability to work would constitute a legitimate, non-discriminatory reason to terminate her employment." *McMillion*, 2014 WL 6809017, at *10. In sum, Jones has failed to put forth a similarly situated employee to create an inference of discriminatory intent.

### 3.    Pretextual Reason

In evaluating whether the proffered reason was pretextual, "the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Naik v. Boehringer*

*Ingelheim Pharms., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010) (quotation omitted). To show

pretext, an employee "must present evidence suggesting that the employer is dissembling."

*Castro*, 786 F.3d at 565 (quoting *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 635 (7th Cir.

2011)), 657 F.3d at 635; *see also Naik*, 627 F.3d at 601. "The question is not whether the

employer's stated reason was inaccurate or unfair, but whether the employer honestly believed

the reason it has offered to explain the discharge." *O'Leary*, 657 F.3d at 635. To meet this

burden, the employee "must 'identify such weaknesses, implausibilities, inconsistencies, or

contradictions' in [the employer's] asserted reason that a reasonable person could find it

unworthy of credence." *Coleman*, 667 F.3d at 852-53 (quoting *Boumehdi v. Plastag Holdings,

LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

Jones spends a lot of time discussing the 2010 elevator incident and the 2011 "home

skillet" comment. However, these events took place *before* he filed his EEOC complaint in

February 2012, and therefore have no bearing on whether the Department fired him because of

his protected activity, which Jones himself claims was the filing of his EEOC complaint. [DE 50

at 25, 33, 43]; *see Durkin v. City of Chicago*, 341 F.3d 606, 614-15 (7th Cir. 2003) ("it is

axiomatic that a plaintiff [must] engage in statutorily protected activity before an employer can

retaliate against [him] for engaging in statutorily protected activity. . . An employer cannot

retaliate if there is nothing for it to retaliate against."). Moreover, Jones also spends pages and

pages discussing evaluations, the loss of the "corporal rank," the unsigned April 2012 written

reprimand, inconsistencies among versions of investigations into the incidents, and

"dissembling" as to the investigations and reprimands. [DE 50 at 28-36.] Yet none of this

argument is on point for the claim of retaliatory discharge. None of the evidence calls into

question the veracity of whether Jones was indeed out of FMLA leave, the Defendants' stated reason for termination. Jones has presented no evidence from which a factfinder could conclude that the Department did not honestly believe he was out of FMLA leave, or that it was not operating procedure to terminate someone following the expiration of their FMLA leave. Jones' speculation about Defendants' motives is insufficient. "It is well settled that speculation may not be used to manufacture a genuine issue of fact." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001) (citations omitted); *see also Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012) (noting that the "subjective beliefs of the plaintiff . . . are insufficient to create a genuine issue of material fact."). Jones has not designated evidence from which a rational jury could conclude that Defendants fired him on account of his protected activity of filing an EEOC complaint.

Even assuming, *arguendo*, Jones could establish a prima facie case, he has failed to dispute the nondiscriminatory reason offered by the Department: failure to return to work after exhaustion of his FMLA leave. Jones has not presented evidence that calls into question the veracity of the Department's assertion that the exhaustion of his medical leave led to his termination. The expiration of Jones' FMLA leave and "[his] inability to work would constitute a legitimate, non-discriminatory reason to terminate [his] employment." *McMillion*, 2014 WL 6809017, at *10; *see also Avila v. Board of Regents of the Univ. Of Wisconsin Sys.*, 95 F.Supp.3d 1074, 1096-97 (E.D. Wis. 2015) (dismissing retaliation claims on summary judgment, finding "[e]ven if [plaintiff] were deemed to have established such a [prima facie] case, with respect to retaliation by termination, the Board has presented a legitimate non-discriminatory reason - the exhaustion of his medical leave."). Therefore, Jones' retaliation claims in Count IV of the amended complaint are dismissed.

C.    Title VII Claims For Intentional Racial Discrimination and Section 1983 Claims

Defendants specifically argue in their memorandum in support of the motion for summary judgment on all counts that they are entitled to summary judgment on Plaintiff's Title VII claims for intentional racial discrimination, Plaintiff cannot demonstrate he was subjected to a hostile work environment in violation of Title VII, and Defendants are entitled to summary judgment on Plaintiff's section 1983 claims [DE 37 at 17-39]. As mentioned earlier, Jones stated in his opposition memorandum that, "for all practical purposes, all of Jones' claims are merged into two basic causes of action: (1) Retaliation for complaining about workplace discrimination, and (2) Violation of the Americans with Disabilities Act." [DE 50 at 25.] This comes very close to (if not actually) conceding that the other claims in the amended complaint are being abandoned.

This is perplexing, as Jones submitted approximately 20 pages in his "statement of genuine disputes" that seem geared towards trying to establish racial animus and discrimination. While one subtitle in Plaintiff's opposition memorandum is "contested issues of fact preclude entry of summary judgment on Jones' claim of intentional racial discrimination and retaliation in Violation of Title VII and 42 U.S.C. § 1983," [DE 50 at 23] and another subtitle is "the facts viewed in a light most favorable to Jones establish a pattern of race-based discrimination before, and retaliation after Jones filed his initial EEOC claim, precluding summary judgment" [DE 50 at 25], aside from these headings, Jones fails to provide any legal argument or case citations to support his claim for racial discrimination and section 1983 claims. In their reply memorandum, Defendants argue that Jones has abandoned his claim for racial discrimination and section 1983 claims [DE 61 at 5, 20].

A non-movant's failure to address claims in response to a motion for summary judgment waives those claims. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned); *Laborers Int'l Union of N. America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the district court in response to summary judgment motions are waived). Moreover, when a plaintiff makes only a perfunctory argument and fails to cite any record evidence in support of a claim, summary judgment should be granted. *See Packer v. Trustees of Indiana Univ. Sch. of Medicine,* 800 F.3d 843, 852 (7th Cir. 2015) (finding cursory defense of a claim on summary judgment resulted in waiver); *Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006) (perfunctory and undeveloped arguments without proper cites to the record are deemed waived); *Ienco v. Angarone*, 429 F.3d 680, 685 (7th Cir. 2005) (finding plaintiff waived claims by failing to develop them in response to defendant's motion for summary judgment); *E.E.O.C. v. U.S. Bell*, 2005 WL 1683979, at *19 (N.D. Ind. 2005) (issues raised in the motion for summary judgment that are not properly responded to by the non-moving party are deemed waived). Jones fails to include any legal argument about his racial discrimination claims and his section 1983 claims, so these claims are waived.

Even assuming, *arguendo*, that Jones did not waive his claims of discrimination, they still fail substantively. "In order to succeed in a Title VII lawsuit, a plaintiff must show that he is a member of a class protected by the statute, that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). The Seventh Circuit has

classified material adverse employment actions into three categories: (1) financial compensation and benefits, (2) a significant reduction in career prospects by not allowing an employee to use the skills in which he was trained, and (3) an objectively hostile work environment. *Tart v. Illinois Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004).

The direct method of proof is the only method discussed by Jones (even though it is in relation to his claim for retaliation), and circumstantial evidence of discrimination often falls into three categories: (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence, statistical or otherwise, that similarly situated employees were treated differently; and (3) evidence that the employer offered a pretextual reason for the adverse employment action. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Similar to the retaliation claim, Jones has not satisfied his prima facie case for a discrimination claim either.

The elevator incident, which does appear to be objectively racially derogatory, and the "home skillet" reference (construing this as racially derogatory at least for the purposes of this motion), is not enough: "[t]he random use of a racial epithet or stray remarks are insufficient to support a hostile environment claim." *Turner v. Hous. Auth. of Jefferson Cnty.*, 188 F. Supp. 2d 1066, 1075 (S.D. Ill. 2002) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Even a severely offensive racial slur is insufficient to state a claim under Title VII and Section 1983. "[O]ffensive racial epithets do not rise to the level of a Title VII violation unless the working environment is dominated by racial slurs." *Lenoir v. Roll Coater, Inc.*, 841 F. Supp. 1457, 1463 (N.D. Ind. 1992), *aff'd,* 13 F.3d 1130 (7th Cir. 1994) ("neither racial comments that are merely part of casual conversation, nor infrequent, sporadic, accidental racial comments or

epithets even if they engender offensive feelings in an employee, rise to the level of a Title VII violation - more than a few isolated incidents of racial harassment must have occurred to prove a claim under Title VII based on working conditions."). So, even though the Court finds such comments disgusting and unprofessional, they are not actionable in this context.

To the extent Jones includes facts about removal of his "corporal" title, Defendants note that he did not plead any claim related to that in the amended complaint, and it is not a materially adverse employment action, because neither Jones' pay nor his employment benefits changed and he continued to perform the same duties [Jones' Dep. at 60-65]. The Department had a legitimate non-discriminatory reason for the change that applied to all jailers who held the title, including a Caucasian male [Mollenhauer Dep. at 16-17; Bell Aff. ¶ 27, 28]; *Tart v. Illinois Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004). As such, taking away the title of corporal does not permit an inference of discrimination, neither does changing his position from administrative deputy to jail deputy, as there was no change in pay, benefits, or promotional opportunities. *See McMillion* , 2014 WL 6809017, at *7  (finding loss of corporal designation at the same jail, because it did not result in a change of pay or benefits, was not a materially adverse employment action under Title VII); *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) ("A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either").

Jones also sets forth facts about the investigation of the elevator incident and the "home skillet" comment, but a faulty investigation is not an independent basis for liability - rather, the investigation becomes material only when considering employer liability under Title VII. *See, e.g., Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998).

Moreover, to the extent Sergeant Vance and Captain Bell may have been confused over the name of the officer involved, this is irrelevant. "To show pretext, the plaintiff must show more than that the defendant's decision was mistaken, ill considered or foolish, and as long as the employer honestly believes the reasons it gives, pretext has not been shown." *Tyler v. Trustees of Purdue Univ.*, 834 F. Supp. 2d 830, 840 (N.D. Ind. 2011) (citation omitted). In sum, Jones has failed to put forth admissible evidence to form the basis of a claim for intentional racial discrimination.

With regard to Jones' section 1983 claims, Defendants specifically argued, and presented case law in support of their arguments that Captain Bell was not personally involved in the provision of radios with the Department or Jones' request for the same, there is no evidence that Sergeant Vance intentionally discriminated against Jones in not providing Jones with a working radio, and that Sergeant Vance did not participate in the decision to terminate Jones. Additionally, Defendants contend that Jones cannot state a section 1983 claim against the individual defendants. [DE 37 at 48-49]. Jones fails to respond to any of these arguments. As such, his section 1983 claims are deemed waived. *See Palmer*, 327 F.3d at 597; *Caruso*, 197 F.3d at 1197. Moreover, it is well settled that a suit against a government officer in his official capacity is treated as a suit against the municipality itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). There is no general *respondeat superior* liability under Section 1983, and instead a municipality will be held liable only if the plaintiff establishes a policy or custom that violates the plaintiff's constitutional rights. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978); *Schor v. City of Chicago*, 576 F.3d 775, 779 (7th Cir. 2009). In this case, Jones has not set forth a policy or custom that violates Jones' constitutional rights. *See, e.g., Cook v. Lain*, No. 2:10-CV-411-PRC, 2013 WL 866876, at *14 (N.D. Ind. Mar. 7, 2013) (granting summary

judgment in favor of sheriff defendant where plaintiff offered no evidence of express policy or custom, or that it caused the alleged constitutional deprivation).

D. ADA Claims

Count III of the amended complaint alleges that Defendants refused to provide accommodations, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, *et seq.* [DE 21 ¶ 27]. The ADA prohibits employers from discriminating against their employees "on the basis of disability." 42 U.S.C. § 12112(a); *see also Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 706 (7th Cir. 2015). To establish a violation of the ADA, an employee must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the employer took adverse action because of her disability or failed to make a reasonable accommodation. *Winsley v. Cook Cnty.*, 563 F.3d 598, 603 (7th Cir. 2009).[5] To establish a prima facie case for failure to accommodate, Jones must show that: (1) he is a qualified individual with a disability; (2) the Department was aware of his disability; and (3) the Department failed to reasonably accommodate the disability. *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011).

One is "disabled" under the ADA if he has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment. 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g); *see also Carothers v. County of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015). The ADA defines "major

---

[5]Congress amended the ADA, effective January 1, 2009, to broaden the class of individuals who qualify as "disabled" under the statute. Pub. L. No. 110-325, 112 Stat. 3553. Although the amendments are not retroactive, *see Winsley*, 563 F.3d at 600 n.1, because the alleged discriminatory actions in this case occurred after 2009, the ADA amendments apply to Jones' claims.

life activities" as including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).

Neither party contests that Jones' eye condition is a disability, or that the Department accommodated his vision disability by placing Jones in the floater position.  Rather, the parties focus their argument on Jones' post-traumatic stress disorder.  First, Defendants contend that Jones has not alleged that his condition substantially limited a major life activity.  According to the recent Code of Federal Regulations ("C.F.R."), the term substantially limits "is not meant to be a demanding standard" and determining "whether an impairment 'substantially limits' a major life activity should not demand extensive analysis."  29 C.F.R. § 1630.2(j)(1)(i) and (iii).  The regulations further provide that the "term 'substantially limits' shall be construed broadly and in favor of expansive coverage[.]" 29 C.F.R. § 1630.2(j)(1)(i).

Although neither party brought this regulation to the Court's attention, there is a recent regulation that lists post-traumatic stress disorder as an impairment that will "virtually always be found to impose a substantial limitation on a major life activity."  29 C.F.R. § 1630.2(j)(3)(ii).  Indeed, the regulation expressly states that "it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . post-traumatic stress disorder . . . substantially limit[s] brain function."  29 C.F.R. § 1630.2(j)(3)(iii).   Keeping in mind this regulation and the ADA amendments which were enacted to ensure broad coverage, the Court turns to analyzing whether Jones' post-traumatic stress syndrome substantially limits a major life activity.

Dr. Israel, a licensed clinical psychologist, evaluated Jones and "diagnosed Mr. Jones as suffering from Post-Traumatic Stress Disorder-Acute." [Israel Aff. ¶ 4.] Dr. Israel noted during his intake/assessment of Jones that "[w]hen he began to relate the events and he got to the suicide, he began to report that something was crawling on his skin. His posture became slumped and his eyes became teary." [DE 50-8, at 2.] Jones also reported that he "continued to see the image of this inmate hanging with his head bowed" and that he "could not get the image out of [his] mind." [*Id.*] Jones argues that his post-traumatic stress syndrome has caused intense emotional turmoil, which would effect concentrating, thinking, and working [DE 50 at 38].

Viewing the facts relevant to Jones' condition in the light most favorable to him, as the Court must at this stage of the proceedings, and assessing those facts under the new, less stringent analysis called for by the ADA amendments, there is sufficient evidence to permit a reasonable jury to find that Jones has a disability under the ADA. This conclusion is supported by the regulation providing post-traumatic stress disorder should virtually always be found to impose a substantial limitation on a major life activity, Dr. Israel's affidavit and treating notes, as well as the fact that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." 29 C.F.R. § 1630.2(j)(1)(iii).

Jones must also establish that he is a "qualified individual" under the ADA, which is defined as an individual with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Defendants specifically argue in their memorandum in support

of the motion for summary judgment that Jones cannot demonstrate that he was a "qualified individual with a disability" within the meaning of the ADA [DE 37 at 41-44]. Jones completely fails to address this requirement, jumping directly to "[t]he deciding question then is whether the employer failed to reasonably accommodate Jones' disability." [DE 50 at 38.] Yet, Jones bears the burden of proof to establish that he was a qualified individual with a disability under the ADA. *Winfrey v. City of Chicago*, 259 F.3d 610, 614 (7th Cir. 2001); *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996) ("The plaintiff bears the burden of proof on this issue; she must be able to show she is a qualified individual with a disability in order to successfully prosecute an ADA claim."). The determination of whether Jones was qualified under the ADA is made at the time of the employment decision (or at the time of his termination). *Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599, 602 (7th Cir. 1999).

In determining whether Jones was qualified to be a jail officer at the time of his termination, the Court applies a two-step analysis. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015). First, the Court considers whether Jones satisfies the prerequisites for the position (which is not at issue in this case). *Id.* Second, the Court considers whether plaintiff can perform the essential functions of the position, with or without reasonable accommodation. *Id.* To determine the essential functions of the employee's position, courts consider such factors as "the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences." *Gratzl v. Office of Chief Judges of the 12th, 18th, 19th, and 22nd Judicial Cirs.*, 601 F.3d 674, 679 (7th Cir. 2010) (quotation omitted); *see also* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3). Courts do give deference to an employer's judgment

regarding which requirements of a particular job are "essential." 42 U.S.C. § 12111(8); *Gratzl*, 601 F.3d at 679 ("[w]e presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary.").

Jones has failed to show that without an accommodation, he could perform the essential functions of a jail officer. However, the next inquiry is whether Jones has established that he can perform the essential functions of being a jail officer *with* an accommodation. A reasonable accommodation can include, *inter alia*, reassignment to a vacant position. 42 U.S.C. § 12111(9). With this Court's exclusion of the last paragraphs of Dr. Israel's affidavit pursuant to the motion to strike, Jones has not provided any admissible evidence showing there was an open position for which Jones was qualified with the restrictions of both Dr. Houck and Dr. Israel. Jones has not presented a way that the Department could have accommodated him to perform the job's essential functions with the restrictions imposed by both Dr. Houck and Dr. Israel. There is a complete lack of any legal argument, and no citation to any case law whatsoever in Jones' memorandum relating to his burden to establish he is a qualified individual and he gives the Court no arguments as to why he can allegedly perform the essential functions of his job with reasonable accommodations. It is not this Court's duty to make legal arguments for the parties involved. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor [the appellate court] are obliged to research and construct legal arguments for the parties"); *United States v. Thornton*, 642 F.3d 599, 606 (7th Cir. 2011)(undeveloped and unsupported arguments may be deemed waived); *United States v. Lanzotti,* 205 F.3d 951, 957 (7th Cir. 2000) ("It is not this court's responsibility to research and construct the parties' arguments,"); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (a skeletal argument does not preserve a

claim for appeal).   And while Jones puts forth factual disputes in his statement of facts, that is not sufficient either, they must be material factual disputes.  *See Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir. 1987) ("The mere existence of a factual dispute will not bar summary judgment unless the disputed fact is outcome determinative under governing law.").

As to the restriction that Jones should be permitted to leave work should his symptoms begin, Defendants have not questioned Sosinski's testimony that in a jail environment,  if there is a traumatic event, an officer cannot just walk away, and that the proposed accommodation by Dr. Israel would have jeopardized the safety of Jones and the inmates [Sosinski Dep. at 6, 19]. Jailers cannot simply leave inmates unsupervised [Bell Dep. at 64], and it is essential for jailers to monitor detainees, perform inspections, and respond to emergencies [Job Description].  As to the restriction that Jones should be limited to one shift of work, a jailer must be able to "respond [] to emergencies on a 24-hour basis" and "assist in administering emergency first-aid measures." [Job Description, D00042,  at 1-4.]  Jones' job description makes clear that it may be necessary for jailers to work extended hours on occasion [*Id.* at 4].   Additionally, Sosinski did not believe the Department could accommodate the restriction that Jones have limited exposure to the cell where the incident occurred, because as a floater, if there was another incident in that cell, Jones would need to respond [Sosinski Dep. at 20].  Jones was unable to perform the essential functions required of a floater with his combined restrictions.

The only additional accommodation Jones seems to hint at (not in the legal argument section, but in his statement of genuine issues), is that he should have been accommodated through more time off work. [DE 50 at 21.]  However, "[t]he rather common-sense idea is that if one is not able to be at work, one cannot be a qualified individual."  *Waggoner v. Olin Corp.*,

169 F.3d 481, 482 (7th Cir. 1999). "Not working is not a means to perform the job's essential functions. An inability to do the job's essential tasks means that one is not 'qualified'; it does not mean that the employer must excuse the inability." *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003). Moreover, an employer is not required to "manufacture a job that will enable the disabled worker to work despite his disability." *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000). While Jones provides a copy of the voluntary furlough policy, presumably as evidence of a policy that permits short term release from work, he has not demonstrated that it was available to him as it appears applicable only to instances of budgetary constraints.

Although Jones now claims that Dr. Israel's restrictions may have lasted only two additional days, a review of the letter establishes that Dr. Israel wrote the four restrictions and then stated: "I would recommend he begin work on July 16, 2012 so I can evaluate his progress on July 18, 2012." [Dr. Israel July 11, 2012 letter.] The letter does <u>not</u> state that the progress would be evaluated so that Jones "could possibly return [] to work without further restrictions," as Jones contends in his memorandum [DE 50 at 18]. "The facts relevant to a determination of whether a medical leave is a reasonable accommodation are the facts available to the decision-maker at the time of the employment decision." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 928 (7th Cir. 2001). There was not a written time frame on the restrictions provided by Jones [Bell Dep. at 72].

Jones did not request continued medical leave or worker's compensation leave prior to his termination, but even if he had, that request must have a "definite endpoint" before it would be considered a reasonable accommodation. *Oestringer v. Dillard Store Servs., Inc*, 92 F. App'x 339, 341-42 (7th Cir. 2004) (holding plaintiff failed to demonstrate that she was a "qualified

individual" where she had already been off work for six weeks and she indicated only that she could not return to work and was still suffering from her condition).

The Seventh Circuit has also held that "[i]t is the plaintiff's burden to show that a vacant position exists for which he was qualified. If such a position is available, then the court may consider whether failure to provide that accommodation was due to a breakdown in the interactive process." *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005) (quoting *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001)). Because Plaintiff has failed to put forth any admissible evidence that a vacant position existed at the Department, nor was there any duty for the Department to create a new job for him, and Jones was unable to perform the essential functions required of a floater with his combined restrictions, Jones has failed to show that he is a qualified individual with a disability under the ADA. As such, the Court's analysis may end there, and it need not consider the interactive process. *Basden v. Professional Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013). As the Seventh Circuit stated in *Basden*:

> [T]he failure to engage in the interactive process required by the ADA is not an independent basis for liability under the statute, and that failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual. *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000). Even if an employer fails to engage in the required process, that failure need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation. *Bombard v. Fort Wayne Newspapers, Inc.*, 921 F.3d 560, 563-64 (7th Cir. 1996). Because there was no evidence permitting a conclusion that [plaintiff] was a qualified individual for ADA purposes, the district court correctly entered summary judgment for [defendant] on her ADA claim despite any shortcomings in [defendant's] response to her request.

*Basden*, 715 F.3d at 1039. In this case, Jones has failed to present evidence sufficient to reach

the jury on the question of whether he was able to perform the essential functions of his job with an accommodation. Consequently, Defendants are entitled to summary judgment on the ADA claims.

<u>Conclusion</u>

For the reasons set forth above, the Motion for Summary Judgment [DE 31] is **GRANTED** and the amended complaint is **DISMISSED WITH PREJUDICE**. The Motion to Strike [DE 55] is **GRANTED IN PART** and **DENIED IN PART**. The Motion to Strike [DE 55] is **GRANTED** as to paragraphs 10-15 of Dr. Israel's affidavit, which are **STRICKEN** as inadmissible testimony.

SO ORDERED.

ENTERED: March 29, 2016

       /s/ JON E. DEGUILIO
Judge
United States District Court